**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 15, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

TIFFANY LITZSINGER,

      Plaintiff - Appellant,

v.

ADAMS COUNTY CORONER'S
OFFICE,

      Defendant - Appellee.

No. 21-1106

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:20-CV-00989-MEH)**

_____

Robert M. Liechty, Robert M. Leichty, PC, Denver, Colorado, for Plaintiff-Appellant.

Michael A. Sink, Assistant County Attorney, Adams County Attorney's Office, Brighton, Colorado (Heidi Miller, County Attorney, and Scott Blaha, Assistant County Attorney, Adams County Attorney's Office, Brighton, Colorado, on the brief) for Defendant-Appellee.

_____

Before **TYMKOVICH**, Chief Judge, **HARTZ**, and **MATHESON**, Circuit Judges.

_____

**TYMKOVICH**, Chief Judge.

_____

      Tiffany Litzsinger worked for the Adams County Coroner's Office from

2013 until she was terminated in 2018. During her employment with the

Coroner's Office, Litzsinger suffered from anxiety and depression, both of which worsened in the months leading up to her termination. After an anxiety episode, Adams County granted Litzsinger temporary leave under the Family and Medical Leave Act (FMLA). When Litzsinger returned from her FMLA leave, the Coroner placed Litzsinger on probation for myriad violations of workplace policies. Shortly after Litzsinger's probation began, the Coroner terminated Litzsinger for violating the terms of her probation. Litzsinger sued the Adams County Coroner's Office under the FMLA and Americans with Disabilities Act (ADA), claiming the Coroner terminated her in retaliation for exercising her rights under both statutes. The district court granted summary judgment for the Coroner's Office because Litzsinger failed to demonstrate that the Coroner's reason for terminating her was pretextual.

Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. We conclude that a rational jury could not find that the Coroner's proffered reason for firing Litzsinger was pretextual.

## I. Background

Because this case arises from an appeal of summary judgment, we present the following factual background in the light most favorable to Litzsinger as the non-moving party, unless contradicted by the record. *See Smothers v. Solvay Chemicals, Inc.*, 740 F.3d 530, 533 (10th Cir. 2014).

Litzsinger served as a medicolegal death investigator for the Adams County Coroner's Office from January 2013 until September 2018. During her

2

employment, Litzsinger's primary supervisors were Chief Coroner Monica
Broncucia-Jordan (the Coroner) and Chief Deputy Coroner Sherronda Appleberry
(the Chief Deputy Coroner).

### A.  Mental Health Treatment

Litzsinger began seeing a counselor for anxiety and depression in 2012, the
year before she began working for the Coroner's Office.  During her employment
with the Coroner's Office, Litzsinger regularly visited the counselor for mental
health assistance.  Litzsinger's supervisors were aware that Litzsinger struggled
with anxiety and asked her on several occasions whether she needed any help.
Litzsinger declined each offer.

In the spring of 2018, the Coroner retained Nicoletti-Flater Associates, a
psychology firm, to provide stress-relief therapy and resiliency training for staff.
Shortly after the Coroner implemented the program, Litzsinger met with Dr.
Dvoskina, one of the retained psychologists, for mental health assistance.

In June 2018, Litzsinger's primary physician diagnosed her with anxiety
and panic attacks.  A physician's assistant encouraged Litzsinger to take medical
leave, but Litzsinger said she did not want to take leave "for fear of retaliation
because the Coroner's Office would consider me to be a problem if I took time
off for a mental condition."  App., Vol. II at 142.

The next month, Litzsinger met with Dr. Dvoskina again.  During this
meeting, Litzsinger "broke down" and Dr. Dvoskina advised her to take FMLA

leave to treat her stress and anxiety. *Id.* Litzsinger again refused to take leave because she feared retaliation from the Coroner.

### B.  FMLA Leave

Towards the end of July 2018, the Coroner and Chief Deputy Coroner drafted a written reprimand to give to Litzsinger.[1]  The draft detailed several performance issues that had occurred in recent months, including Litzsinger's failure to comply with the Coroner's secondary employment policy, struggles to stay awake on shift, and problems with completing tasks on time.

On August 3, 2018, Litzsinger had to perform an external exam on a decomposed body during a night shift.  While on duty, Litzsinger called the Coroner and told her that she could not perform the exam.  When the Coroner asked Litzsinger why she could not do the exam, Litzsinger refused to answer, saying only that she was "burnt out" and that someone at Nicoletti-Flater was going to call the Coroner to explain.  App., Vol. II at 145.

Following Litzsinger's refusal to perform the exam, the Coroner told Litzsinger that they would meet the following week to "discuss this incident, [your] overall performance, and whether or not [you] can do this job." *Id.*  The Coroner decided not to give Litzsinger the written reprimand that had already been drafted because she believed stricter punishment was warranted.

---

[1]  Prior to 2018, the Coroner had formally disciplined Litzsinger on multiple occasions for failing to properly fill out reports, missing deadlines, not completing tasks, and insubordination.

On August 9, 2018, during the week in which the Coroner planned to meet with Litzsinger to discuss the disciplinary issues, Litzsinger suffered chest pain at work and was transported to the emergency room via ambulance. The next day, Litzsinger met with her physician's assistant, who told Litzsinger that her chest pain was likely a manifestation of her anxiety and depression. The physician's assistant encouraged Litzsinger to take medical leave.

Litzsinger requested leave from August 9 to August 21 to address her mental health needs. The Coroner told Litzsinger via email that she would need to utilize FMLA leave because the requested leave time exceeded the standard sick leave timeframe. The Coroner provided Litzsinger with the necessary FMLA paperwork. She also told Litzsinger the following:

> As previously discussed following the incident on 08/03, I was planning to meet with you on your workweek of 08/08 to discuss your job. However, now that you are on leave, we will have to move this meeting to a later date when you return.

App., Vol. I at 119.

The day after Litzsinger began her FMLA leave, the Coroner emailed Dr. Shawn Knadler, a clinical associate at Nicoletti-Flater, to explain the circumstances of Litzsinger's hospital visit and FMLA leave. The Coroner informed Dr. Knadler about Litzsinger's refusal to perform an external exam and how Litzsinger had told the Coroner that someone from Nicoletti-Flater would call to explain why Litzsinger could not execute her assigned tasks. The Coroner also told Dr. Knadler that Litzsinger went to the ER for "chest pain" and that it

5

"now appears that she is going on FMLA via that route." App., Vol. II at 145. In

closing, the Coroner told Dr. Knadler,

> I implemented this mental health program through your
> organization to promote employee resiliency. It is
> obviously highly suspect that this employee was going
> to try to abuse this. She may still seek to be seen at
> your organization during her leave of absence (which I
> promote). However, it would not surprise me if she still
> seeks FMLA or an extension of the FMLA approved by
> her physician. I am requesting that your organization
> refer any of my employees, that may be seeking
> psychological FMLA leave, to their own private
> psychologist. Please let me know your thoughts and if
> you see a problem with this approach.

*Id.* In his response to the Coroner, Dr. Knadler acknowledged that Nicoletti-

Flater's wellness sessions are limited in scope and that requests for FMLA should

be "completed through [employees'] primary therapists." *Id.* at 144.

### C. Disciplinary Meeting and Probation

Litzsinger returned from FMLA leave on August 21. On August 30, the

Coroner and Chief Deputy Coroner met with Litzsinger to discuss her

performance issues. The conversation covered many of the same topics that were

included in the written reprimand drafted prior to Litzsinger taking leave, such as

Litzsinger's secondary employment, sleeping during graveyard shifts,[2] and failure to meet deadlines.

The Coroner was particularly troubled by Litzsinger's excessive use of the Internet for personal reasons at work. During a review of Litzsinger's Internet history, the Coroner discovered that Litzsinger spent an average of 90 to 120 minutes per shift using the Internet for reasons other than work, such as social media and online shopping. The Coroner also identified several timesheets where Litzsinger recorded her time as working on reports, but where Litzsinger's Internet history showed that she was instead visiting personal Internet websites. The Coroner also noted that Litzsinger was chronically behind on her work, which made the personal Internet use more egregious.

The Coroner ultimately decided to place Litzsinger on probation instead of terminating her. But the Coroner remarked that she could terminate Litzsinger for many reasons, including dereliction of duty, fraudulent timesheets, using the Internet for personal reasons, and consistently being behind on her work. Litzsinger did not deny that she had committed the alleged violations of

---

[2] Litzsinger told her supervisors during the meeting that she could not work graveyard shifts anymore because her evening medication made her sleepy. The Chief Deputy Coroner said that the proper way to handle the situation would have been for Litzsinger to raise the issue through the appropriate channels and present a doctor's note rather than sleep on shift. The Chief Deputy Coroner also mentioned that she had asked Litzsinger whether she needed assistance or adjustments in her work due to her mental health and that Litzsinger had always declined any help. Litzsinger said she refused help and accommodations because she thought it would show weakness and possibly lead to disciplinary action.

workplace policies.  Instead, she agreed with the Coroner, telling her, "You have every right to terminate me right now."  Ex. V (audio clip), at 01:31–33 (filed conventionally).

The terms of Litzsinger's probation included the following:

- Refrain from using the Internet for personal reasons while at work

- Complete all work tasks within assigned timeframes

- Follow every policy and procedure and ask if any policy or procedure seems unclear

At the end of the disciplinary meeting, the Coroner told Litzsinger that she would not be given any more chances and that if there were further issues, Litzsinger would be terminated.  Litzsinger acknowledged the terms of her probation and the consequences of noncompliance.  Litzsinger then thanked the Coroner for being fair and for giving her an opportunity to keep her job in a probationary status.

### D.  Termination

In the two weeks after she was put on probation, Litzsinger continued to use the Internet for personal reasons.  The Coroner identified ten websites that Litzsinger visited while on probation that were unrelated to her work.  Litzsinger admits that she accessed a utility company website for her son on one occasion and that she showed her co-workers her personal photography website on another occasion.  Litzsinger claims that the other websites in her Internet history were all for work purposes.

The Coroner's Office terminated Litzsinger on September 16, 2018 for violating the terms of her probation.

### E.  Procedural History

Litzsinger sued the Coroner's Office for retaliation in violation of the FMLA, 29 U.S.C. § 2615(a), and the ADA, 42 U.S.C. § 12112(a).  The Coroner's Office moved for summary judgment on both claims.  The district court granted summary judgment for the Coroner's Office, finding that Litzsinger failed to show that the Coroner's proffered reasons for termination were pretextual.

## II.  Analysis

"We review a grant of summary judgment de novo, drawing all reasonable inferences and resolving all factual disputes in favor of the non-moving party." *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 968 (10th Cir. 2017) (quoting *Birch v. Polaris Industries, Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015)).

We analyze FMLA retaliation and ADA discrimination claims under the three-step framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Smothers*, 740 F.3d at 537–38.  First, "the plaintiff must establish a prima facie case of discrimination or retaliation."  *Id.*  The burden then shifts to the defendant, who must proffer "a legitimate non-discriminatory reason for the adverse employment action."  *Id.*  At the third step, the burden shifts back to the plaintiff to "show there is at least a genuine issue of material fact as to whether the employer's proffered legitimate reason is genuine or pretextual."  *Id.*

The parties do not dispute that the first two prongs of the *McDonnell-Douglas* framework are met.  Our analysis thus focuses only on the third prong of the framework, which is whether a reasonable juror could find that the Coroner's proffered reason for terminating Litzsinger was pretextual.

"A plaintiff demonstrates pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's proffered explanation is unworthy of credence."  *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (citation omitted).  Pretext may be established by revealing "weaknesses, implausibilities, inconsistencies, incoherence, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Jencks v. Modern Woodmen of Am.*, 479 F.3d 1261, 1267 (10th Cir. 2007) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

To support an inference of pretext, the plaintiff "must produce evidence that the employer did more than get it wrong."  *Johnson v. Weld Cty., Colo.*, 594 F.3d 1202, 1211 (10th Cir. 2010).  The plaintiff "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda."  *Id.*

We agree with the district court that Litzsinger failed to show a genuine issue of material fact regarding pretext.  Analyzing the evidence in the light most favorable to Litzsinger, we conclude no reasonable juror could find the Coroner's

reason for terminating Litzsinger was pretextual.  Other than the temporal

proximity between Litzsinger's FMLA leave and her termination—which, absent

more, does not establish pretext—Litzsinger presents no circumstantial evidence to

show that the Coroner's proffered reason for terminating her was false or unworthy

of belief.

The Coroner's Office says it fired Litzsinger for violating the terms of her

probation by using the Internet for personal reasons.  Litzsinger claims this

reason is pretextual and that the Coroner's Office terminated her because she has

a disability and in retaliation for taking FMLA leave.  To support her pretext

argument, Litzsinger presents the following evidence: (1) the Coroner expressed

frustration and skepticism about Litzsinger taking FMLA leave; (2) an employee

normally would not be terminated for personal Internet use at work; and (3) the

Coroner's reasons for terminating Litzsinger changed over time.[3]

We analyze each argument in turn.

### A.  The Coroner's Statements

Litzsinger first claims that certain statements made by the Coroner

demonstrate the Coroner had a retaliatory motive when she terminated Litzsinger.

---

[3] Litzsinger briefly mentions temporal proximity as evidence of pretext in her
reply brief.  We agree with the district court that the timing of Litzsinger's
probation and termination is "reasonable evidence of pretext."  App., Vol. II at
219.  But our caselaw is clear that the timing of an adverse employment action is
insufficient on its own to demonstrate pretext.  *See Proctor v. United Parcel
Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) ("Although we may consider
evidence of temporal proximity—typically used to establish a prima facie case—
in analyzing pretext, temporal proximity alone is insufficient to raise a genuine
issue of material fact concerning pretext.").

According to Litzsinger, these statements are strong evidence of pretext because they show that "a discriminatory reason more likely motivated" the termination decision than the Coroner's proffered legitimate justification. *See Zamora*, 478 F.3d at 1166 (citation omitted).

In her email to Nicoletti-Flater Associates, the Coroner explained that she had planned to meet with Litzsinger on August 9 to discuss Litzsinger's performance and her refusal to perform an external exam on a decomposed body. The Coroner then described how prior to the planned meeting, Litzsinger "began having 'chest pain' and left the office in [an] ambulance" and that it "now appears that she is going on FMLA via that route." App., Vol. II at 145. In the closing paragraph of the email, the Coroner said, "I implemented this mental health program through your organization to promote employee resiliency. It is obviously highly suspect that this employee was going to try to abuse this." *Id.*

While Litzsinger concedes these statements are not direct evidence of retaliation, she argues the email shows the Coroner thought Litzsinger was abusing the FMLA process, faking her disability, and that a "natural human reaction is to retaliate against the person for such abuse." Aplt. Br. at 22.

The district court acknowledged that the email shows skepticism but concluded that it cannot reasonably be read as showing an intention to retaliate. The court concluded that the email "suggests that the Coroner believed that Plaintiff chose to use FMLA leave to avoid a discussion with her regarding employment performance issues." App., Vol. II at 217.

We agree with the district court that a reasonable jury could not conclude that the Coroner's email casts doubt on the Coroner's proffered reason for terminating Litzsinger. The broader context shows that the Coroner was frustrated with the *way* that Litzsinger sought FMLA leave, not with the fact that she used leave. Specifically, the Coroner was concerned that instead of seeking FMLA leave through her primary psychiatrist, Litzsinger had improperly used Nicoletti-Flater.[4]

The response email from Dr. Knadler reinforces this interpretation. After discussing a few options for how the Coroner could respond to Litzsinger's situation, including disciplinary action, Dr. Knadler told the Coroner,

> We will ensure that . . . all of your employees are aware of the objectives and limitations of the wellness sessions. This includes that requests for FMLA would be completed through their primary therapists and that they are encouraged to discuss any concerns/problems they are experiencing directly with their supervisor/management.

*Id.* at 144. This response addresses the concerns raised by the Coroner—that Litzsinger's use of the firm to seek FMLA leave and avoid talking to her supervisors exceeded the scope of the firm's purpose, which was to provide stress-relief services and resiliency training. The full context of the Coroner's email and Dr. Knadler's response therefore demonstrate that the Coroner's

---

[4] The Coroner was also displeased that Litzsinger had used Nicoletti-Flater to avoid telling the Coroner why she could not perform her assigned external exam on the night of August 3. Litzsinger had told the Coroner that someone from Nicoletti-Flater would call to explain why Litzsinger could not do the exam.

13

concerns about Litzsinger abusing the process referred to the improper use of Nicoletti-Flater rather than Litzsinger's decision to take FMLA leave. Thus, the email does not show pretext.

Litzsinger also claims the Coroner thought Litzsinger was faking her disability because she put "chest pain" in quotation marks in her email to Dr. Knadler. But the record shows that the Coroner understood many of her employees suffered from mental health problems due to the nature of the work. That is the precise reason she hired Nicoletti-Flater—to provide resiliency training for staff. Other evidence in the record shows that the Coroner and Chief Deputy Coroner knew about Litzsinger's mental health struggles and asked her on multiple occasions whether she needed any help or accommodations.[5] Given this evidence, a reasonable jury could not conclude the Coroner retaliated against Litzsinger for faking her disability.

Litzsinger analogizes her situation to that of the plaintiff in *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875 (10th Cir. 2018). In *Fassbender*, we found evidence of pretext where a prison contractor terminated a pregnant employee for taking an inmate's handwritten note home in violation of the contractor's fraternization policy. *Id.* at 881. We concluded a reasonable jury could find pretext because the employee's supervisor had made several hostile

---

[5] In her yearly performance appraisal, Litzsinger and her supervisors agreed that one of Litzsinger's 2018 performance objectives would be to "[m]aintain mental health awareness and seek assistance before impacts to performance arise." App., Vol. I at 104.

statements about pregnant workers and the employer's proffered reasons for termination changed over time.

Litzsinger compares the comments made by the supervisor in *Fassbender* to those made by the Coroner to Dr. Knadler. But the Coroner's comments do not come close to the level of hostility and discrimination exhibited by the supervisor in *Fassbender*. As explained above, the Coroner's comments reflect frustration with the way Litzsinger utilized Nicoletti-Flater, not with her disability or the fact that she took FMLA leave. The Coroner's email also does not indicate a desire to terminate or otherwise discipline Litzsinger in retaliation for taking FMLA leave, which is distinguishable from *Fassbender*.

In sum, the Coroner's statements do not show that the Coroner's Office "didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory agenda." *See Johnson*, 594 F.3d at 1211.

### B. Disparate Treatment

Litzsinger next argues that an employee normally would not be terminated for using the Internet for personal reasons. In her declaration, Litzsinger explained that it was "common practice for the death investigators to moderately use the office Internet for personal purposes." App., Vol. II at 143. Litzsinger's claim is supported by the Coroner's Electronic Media Usage Policy, which permits "[i]ncidental appropriate personal use of County internet." App., Vol. I at 109.

Evidence of disparate treatment can undercut the credibility of an employer's proffered justification for an adverse action. A plaintiff may "show pretext on a theory of disparate treatment by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated work rules of comparable seriousness." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000).

Litzsinger does not identify any similarly situated employees who were treated differently than her for their personal Internet use. Instead, she alleges generally that a "regular employee" would not have been terminated "merely for going onto the Internet for five minutes." Aplt. Br. at 15.

While it is likely true that under normal circumstances an employee would not be fired for intermittent personal use of the Internet, Litzsinger's circumstances were not normal. Unlike other employees, Litzsinger was on probation precisely because she excessively used the Internet for reasons unrelated to work. So although minor use of the Internet would have "normally been no issue," *see id.* at 28, it was an issue in Litzsinger's case because it violated the strict terms of her probation.

The Electronic Media Usage Policy makes it clear that personal use of the Internet at work is a "privilege" that may be revoked "at the discretion of the Chief Coroner or management staff." App., Vol. I at 109. The policy states that an employee's personal use of the Internet "must be incidental . . . not violate Coroner policy, or interfere with an employee's assigned duties or efficient use of

16

time." *Id.* It is undisputed that Litzsinger's Internet use violated these policy terms and that the Coroner prohibited Litzsinger's personal Internet use while on probation. Given this backdrop, the fact that Litzsinger was terminated for using the Internet while other employees faced no adverse action is unsurprising.

Because Litzsinger failed to provide evidence that she was treated differently from other similarly situated, nonprotected employees who used the Internet in violation of the Coroner's policy, she cannot satisfy her burden of showing pretext on a theory of disparate treatment.

### C. Changing Justifications for Termination

The final argument we address is Litzsinger's claim that the Coroner's reasons for termination have changed throughout this litigation and that such inconsistences show the Coroner's proffered reason for termination is pretextual.

Contradictions or inconsistencies in an employer's proffered reason for termination can be evidence of pretext. *Whittington v. Nordam Group Inc.*, 429 F.3d 986, 994 (10th Cir. 2005). For instance, a jury can reasonably infer pretext when an employer provides one explanation for an adverse action but later affirmatively disclaims or otherwise abandons the rationale. *Id.* But pretext cannot be established by "the mere fact that the [employer] has offered different explanations for its decision." *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1311 (10th Cir. 2005). Rather, "inconsistency evidence is only helpful to a plaintiff if 'the employer has changed its explanation under circumstances that

suggest dishonesty or bad faith.'" *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1002 (10th Cir. 2011) (quoting *Jaramillo*, 427 F.3d at 1310).

During the probation meeting on August 30, the Coroner listed the many policy violations committed by Litzsinger and told her, "There are a million reasons to terminate you." Ex. U (audio clip), at 00:01–07 (filed conventionally). The Coroner explained that Litzsinger could be fired for, among other things, "dereliction of duty, fraudulent records, [and] spending extensive worktime doing email/internet searches." *Id.* at 00:09–21. Litzsinger agreed with the Coroner's assessment and admitted to her that "you have every right to terminate me right now."[6] Ex. V at 01:31–33. Instead of terminating Litzsinger, the Coroner placed her on probation and made it clear that while on probation, Litzsinger would only be allowed to use the Internet for work-related reasons.

Less than two weeks after she was placed on probation, several co-workers reported that Litzsinger had visited personal websites during work hours. Litzsinger's supervisors checked her Internet history and confirmed the report. Litzsinger admits that she briefly visited a utilities website to help her son with a

---

[6] Litzsinger claims this comment lacked sincerity and that she only said it "to be subservient." App., Vol. II at 143. But Litzsinger does not offer any evidence to contest the validity of any of the grounds supporting termination. Instead, Litzsinger admitted during her deposition that she violated numerous Coroner's Office policies. The admitted violations include missing deadlines in violation of the case completion policy, App., Vol. I at 45–46, using the Internet for 60-90 minutes per shift for personal reasons in violation of the electronic media usage policy, *id.* at 47–48, and submitting erroneous timecards in violation of the time records policy, *id.* at 52–53.

18

power outage.  She also admits that she visited a photography website to show co-workers photos from her photography business.[7]

The Coroner terminated Litzsinger on September 16, 2018.  The parties agree that on that day, the Coroner told Litzsinger that she was being fired for visiting personal websites at work in violation of her probation.  Litzsinger says the Coroner "gave me no other reason for termination."  App., Vol. II at 143.

Litzsinger concedes that the Coroner has never abandoned personal Internet use as the reason for termination.  Instead, she argues that once litigation commenced, the Coroner gave additional reasons for termination, which raises the question of whether the Coroner's initial proffered reason is legitimate or pretextual.

Litzsinger first directs us to the deposition testimony of Chief Deputy Coroner Appleberry.  During her deposition, Appleberry said that the Coroner terminated Litzsinger for violating the terms of her probation.  Appleberry then explained that Litzsinger violated her probation by "using her computer for personal use," "not working," and "retaliating against her coworkers" for

---

[7] While Litzsinger admits she visited these websites during work hours, she says she did not think the visits violated the terms of her probation.  But the Coroner made it clear that while on probation, "You will not be on the internet doing anything other than work."  Ex. W (audio clip), at 00:13–16 (filed conventionally).  The Coroner also told her, "You will follow every policy and procedure and directive as it is stated to you without inserting your own assumptions or interpretations of it.  And if you have questions about what it means, you will ask."  *Id.* at 00:46–01:04.  Given these clear terms, Litzsinger plainly violated her probation by visiting the utilities website and photography website.

reporting her behavior.  App., Vol. II at 149.  Litzsinger contends that these additional reasons for termination conflict with what the Coroner told Litzsinger on the day she was terminated, which is that she was being terminated for her personal Internet use.

We disagree.  The additional justifications are not inconsistent with the Coroner's proffered reason for termination—rather, they are part of the same violation.  Litzsinger was "not working" because she was on the Internet for personal reasons.  And Litzsinger retaliated against her co-workers because they reported her for using the Internet instead of working.  The fact that the Coroner provided additional reasons for termination resulting from the underlying cause for termination does not show pretext.  *See Matthews v. Euronet Worldwide, Inc.*, 271 F. App'x 770, 774 (10th Cir. 2008) (unpublished) ("[T]here is no support for a finding of pretext if the employer does not give inconsistent reasons, but instead merely elaborates on the initial justification for termination.").

Litzsinger next points us to the Coroner's Motion for Summary Judgment, where the Coroner explained that it "had several legitimate non-retaliatory reasons for the termination," including Litzsinger "falsifying her timecards," being "chronically behind on her work," "creat[ing] extra work for her coworkers," and "caus[ing] delays for funeral homes and the families of the deceased."  App., Vol. I at 38.

We are not persuaded that these additional reasons show pretext.  Reading the motion as a whole, it is apparent that these reasons were simply bolstering the

Coroner's claim that Litzsinger's termination was justified. The motion does not say that Litzsinger was terminated for the additional reasons,[8] only that Litzsinger could have been justifiably terminated for any number of reasons. These reasons provide support for the Coroner's statement in the August 30 meeting that there were "a million reasons" to terminate Litzsinger. Ex. U, at 00:01–07. Thus, the additional reasons are not inconsistent with the Coroner's reason for termination and do not show pretext.

Litzsinger analogizes the Coroner's shifting explanations to those of the employer in *Fassbender*. But the employer's conduct in *Fassbender* is distinguishable. Here, the Coroner told Litzsinger that she was being terminated for her personal use of the Internet while on probation and the Coroner has never abandoned that initial explanation for termination. The Coroner has always maintained that it fired Litzsinger for improper use of the Internet. Although the Coroner offered additional explanations for why probation and termination were justified, Litzsinger has not shown why these additional reasons undermine the Coroner's proffered legitimate reason for termination.

Litzsinger takes issue with the district court's statement that to demonstrate pretext, "Plaintiff must show *contradictions* in Defendant's legitimate reasons." *See* App., Vol. II at 218. Litzsinger contends "there is no rule that the various

---

[8] In the motion, the Coroner's Office does not abandon its claim that Litzsinger was fired for violating the terms of her probation. And the only probation violation discussed in the motion is Litzsinger's personal use of the Internet. *Id.* at 35, 39.

reasons for termination contradict each other to raise an inference of incredibility. The differing reasons only need [to] show a lack of credibility." Aplt. Br. at 25.

Litzsinger is correct that different reasons for termination do not have to be contradictory to show pretext—they only need to undermine the credibility of the employer's proffered reason for termination. But this point of law provides no help to Litzsinger because she fails to demonstrate how any of the Coroner's reasons for termination show a lack of credibility. Providing additional justifications for termination without abandoning the primary reason for termination does not, without more, establish pretext. To support an inference of pretext, the additional justifications must "suggest dishonesty or bad faith." *Twigg*, 659 F.3d at 1002 (citation omitted). While it is true that the Chief Deputy Coroner noted additional probation violations in her deposition and the motion for summary judgment included a list of other policy violations that could have supported termination, the Coroner's Office never deviated from its initial justification for terminating Litzsinger—her Internet use. Litzsinger provides no evidence to show why the additional reasons—which are supported by the record—demonstrate that Litzsinger's probation violation is too "weak, implausible, inconsistent, incoherent, or contradictory" to believe as the legitimate reason for termination. *See Fassbender*, 890 F.3d at 890 (quoting *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1179 (10th Cir. 2006)).

## III.  Conclusion

We accordingly AFFIRM the district court.